[No. C003388. Third Dist. Nov. 20, 1992.]

BARCLAYS BANK INTERNATIONAL LIMITED, Plaintiff and Respondent, v.
FRANCHISE TAX BOARD, Defendant and Appellant.

BARCLAYS BANK OF CALIFORNIA, Plaintiff and Respondent, v.
FRANCHISE TAX BOARD, Defendant and Appellant.

1744

## COUNSEL

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Timothy G. Laddish, Assistant Attorney General, Robert F. Tyler and Robert D. Milam, Deputy Attorneys General, for Defendant and Appellant.

Joanne M. Garvey, Joan K. Irion, Teresa M. Maloney, and Heller, Ehrman, White & McAuliffe for Plaintiffs and Respondents.

Lawrence V. Brookes, Valentine Brookes, Jane H. Barrett, F. Eugene Wirwahn, David F. Levi, United States Attorney, William S. Rose, Jr., Assistant United States Attorney General, Gary R. Allen, David English Carmack, John J. McCarthy and Richard A. Correa, as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

DAVIS, J.—In this case we originally concluded that California's unitary tax method of worldwide combined reporting (based on Rev. & Tax. Code, §§ 25101, 25120-25139), as applied to foreign-based unitary corporate groups, was unconstitutional under the foreign commerce clause in light of the "one-voice" component of judicially established dormant foreign commerce clause analysis. (U.S. Const., art. I, § 8, cl. 3; *Japan Line, Ltd.* v. *County of Los Angeles* (1979) 441 U.S. 434 [60 L.Ed.2d 336, 99 S.Ct. 1813]; *Container Corp.* v. *Franchise Tax Bd.* (1983) 463 U.S. 159 [77 L.Ed.2d 545, 103 S.Ct. 2933]; *Wardair Canada* v. *Florida Dept. of Revenue* (1986) 477 U.S. 1 [91 L.Ed.2d 1, 106 S.Ct. 2369].) In *Barclays Bank Internat. Ltd.* v. *Franchise Tax Bd.* (1992) 2 Cal.4th 708 [8 Cal.Rptr.2d 31, 829 P.2d 279], the California Supreme Court disagreed with our conclusion and remanded this matter to us. Pursuant to that remand, we have been directed to consider whether the administrative burden for a foreign-based unitary corporate group (such as exemplified by plaintiffs) in complying with worldwide combined reporting violates either the nondiscrimination component of dormant commerce clause analysis (*Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274 [51 L.Ed.2d 326, 97 S.Ct. 1076]; *Japan Line, supra,* 441 U.S. 434) or due process. (*Barclays, supra,* 2 Cal.4th at pp. 742-743.) We conclude that neither of these principles is violated on "compliance burden" grounds by California's application of worldwide combined reporting to plaintiffs in the context of a properly applied regulation (Cal. Code Regs., tit. 18, § 25137-6) governing such reporting.

### BACKGROUND

When a corporation conducts business in more than one jurisdiction, either through branches or subsidiaries, the proper allocation of income for tax purposes becomes an issue. Essentially, two methods of allocating income have evolved to resolve this issue: the arm's-length/separate accounting method and the unitary business/formula apportionment method. As to multinational corporations, California employs a common variant of the unitary method called worldwide combined reporting (WWCR).

Under the arm's-length/separate accounting method, the various affiliated corporations of a multijurisdictional enterprise are viewed as separate from one another and the income attributable to any particular jurisdiction is determined on the basis of internal accounting records reflecting the activity of the affiliate within that jurisdiction. To preclude tax-manipulative intercorporate transfers of goods, services or other value, this accounting method

requires that the tax reporting entity deal at "arm's length" with its affiliated businesses as if they were simply unrelated entities dealing in the marketplace.

In contrast, under the unitary business/formula apportionment method of accounting employed by California (WWCR), the affiliated corporations of a multijurisdictional enterprise are treated as units of a single business—that is, as a "unitary group." (Cal. Code Regs., tit. 18, § 25137-6.) If a corporation doing business in California is deemed to be part of a unitary group, the total income for that group, including corporations or affiliates operating wholly outside California or the United States for that matter, is apportioned to California by a three-factor formula. The formula takes into account property, payroll, and sales (revenue in this case) for the group in California, as a fraction of total worldwide property, payroll, and sales. (See Rev. & Tax. Code, §§ 25128-25136; Note, *State Worldwide Unitary Taxation: The Foreign Parent Case* (1985) 23 Colum. J. Transnat'l L. 455, fn. 2 (hereafter 23 Columbia Journal).) The fraction is then multiplied against the unitary group's total income, producing an apportioned amount of such income taxable by California. Because intercorporate transactions are disregarded, it is unnecessary to make "arm's length" adjustments.

The present controversy involves challenges to additional tax assessments for the year 1977 resulting from California's use of WWCR. Those additional assessments were levied after the defendant California Franchise Tax Board (Board or the Board) determined that the plaintiff taxpayers, Barclays Bank of California (Barcal) and Barclays Bank International (BBI), and their ultimate corporate parent, Barclays Bank Limited (BBL), as well as the significant subsidiaries of BBI and BBL, constituted a unitary group. Barcal was directed to pay an additional $152,420 and BBI an additional $1,678. Under protest Barcal and BBI (referred to collectively as plaintiffs) paid the additional taxes and this suit ensued.

## DISCUSSION

1. *The Sufficiency of Plaintiffs' Claims for Refund*

As a preliminary matter, the Board contends that plaintiffs are foreclosed from litigating the compliance burden as it relates to the commerce clause and the due process clause because these issues were not set forth in plaintiffs' claims for refund. We disagree.

The California Constitution in article XIII, section 32 provides that "[a]fter payment of a tax claimed to be illegal, an action may be maintained to

recover the tax paid, with interest, in such manner as may be provided by the Legislature." (See *Shiseido Cosmetics (America) Ltd.* v. *Franchise Tax Bd.* (1991) 235 Cal.App.3d 478, 486-488 [286 Cal.Rptr. 690].) Pursuant to this constitutional authority, the Legislature has provided the procedures for seeking refunds in cases such as this one. **(2)** Under Revenue and Taxation Code section 26074 (all further statutory references are to this code), a claim for refund must state the specific grounds upon which it is based. A taxpayer can bring an action only upon these grounds. (§ 26102.) In fact, courts are without jurisdiction to consider grounds not set forth in the claim. (*Atari Inc.,* v. *State Bd. of Equalization* (1985) 170 Cal.App.3d 665, 672 [216 Cal.Rptr. 267].) This is because the specific constitutional source of legislative power to control tax refund suits mandates strict adherence to the administrative procedures set forth by the Legislature before a court action can be filed. (See *Shiseido Cosmetics (America), supra,* 235 Cal.App.3d at p. 488; *Patane* v. *Kiddoo* (1985) 167 Cal.App.3d 1207 [214 Cal.Rptr. 9]; *Woosley* v. *State of California* (1992) 3 Cal.4th 758 [13 Cal.Rptr.2d 30, 838 P.2d 758].)

 Here, plaintiffs did not file claims for refund as such. Instead, they filed written protests against proposed additional taxes (§ 25664) which were transformed by law into claims for refund. (§ 26078.) Under section 26078, if a taxpayer pays the protested tax before the Board decides the protest, the protest is treated as a claim for refund. Like a claim for refund, a section 25664 protest must specify the grounds upon which it is based.

The plaintiffs set forth the following grounds in their consolidated protests based on the commerce clause and due process clause:

"The Foreign Commerce Clause of the federal Constitution and treaties prohibit application of the unitary filing to the taxpayer.

"Whether the Commerce Clause of the United States Constitution limits the taxation of a unitary business to income derived from activities carried on within the United States.

"Whether the Due Process . . . Clause[] of the United States Constitution limit[s] the application of the California method of reporting and tax to activities carried on within the United States because of arbitrary and unreasonable distortions created by including non-U.S. source income in the tax base or because the method falls unfairly on taxpayers owned by foreign affiliates whose income is used as a measure of the tax."

We think these stated grounds are sufficient to encompass the "compliance burden" issues. The protests allege that California's *method of reporting falls*

*unfairly* on taxpayers owned by foreign affiliates. The direct implication of this language is that foreign-based unitary groups bear an unfair burden in complying with WWCR. Two decisions provide some guidance regarding the specificity required for a refund claim. In *Wallace Berrie & Co.* v. *State Bd. of Equalization* (1985) 40 Cal.3d 60 [219 Cal.Rptr. 142, 707 P.2d 204], the court concluded that a particular issue had been raised in the claim although it was set forth only indirectly. (*Id.* at p. 66, fn. 2.) In *King* v. *State Bd. of Equalization* (1972) 22 Cal.App.3d 1006 [99 Cal.Rptr. 802], this court deemed a refund claim's assertion of " 'erroneously and illegally' collected and computed taxes" far too diffuse to meet the specificity requirement. (*Id.* at p. 1015.) The "refund claim" here is more akin to the one in *Wallace Berrie* than to the one in *King*.

The Board spends considerable effort in arguing that this court's decision in *Shiseido* should apply here. But that case is distinguishable. In *Shiseido*, there was *no* refund claim because the tax was paid after the protest proceedings were final and therefore the prepayment protest could not be considered such a claim. (235 Cal.App.3d at pp. 491-492; see § 26078.) In fact, *Shiseido* distinguished *Wallace Berrie* by noting that "*Wallace Berrie* has no application to this case, where there was no refund claim." (*Id.* at p. 492.)

Consequently, we conclude the plaintiffs have adequately set forth the compliance burden in the appropriate constitutional contexts. We proceed to consider that burden in the context of the commerce clause and the due process clause.

2. *The Nondiscrimination Requirement in the Complete Auto-Japan Line Dormant Commerce Clause Test*

■ Article I, section 8, clause 3 of the United States Constitution gives Congress the power "To regulate commerce with foreign nations, and among the several states, . . ." The commerce clause not only grants Congress the authority to regulate commerce among the states and with foreign nations, but also directly limits the power of states to discriminate against interstate or foreign commerce. (*New Energy Co.* v. *Limbach* (1988) 486 U.S. 269, 273 [100 L.Ed.2d 302, 308, 108 S.Ct. 1803]; *Container, supra,* 463 U.S. at p. 170 [77 L.Ed.2d at pp. 556-557].) This latter limitation is within the " 'negative' " aspect of the commerce clause. (*New Energy Co., supra,* 486 U.S. at p. 273 [100 L.Ed.2d at p. 308].) States are prohibited from discriminating against foreign commerce in order to ensure that such commerce remains the province of federal oversight and that individual states do not work to the

detriment of the nation as a whole. (*Wardair, supra,* 477 U.S. 1; see *Maryland* v. *Louisiana* (1981) 451 U.S. 725, 754 [68 L.Ed.2d 576, 600, 101 S.Ct. 2114].) When Congress has not acted or purported to act in a situation implicating the commerce clause, the judiciary engages in "dormant" commerce clause analysis under the "negative" aspect of the clause. (*Merrion* v. *Jicarilla Apache Tribe* (1982) 455 U.S. 130, 154-155 [71 L.Ed.2d 21, 40-41, 102 S.Ct. 894]; *Barclays, supra,* 2 Cal.4th at p. 725, fn. 9.)

In *Japan Line, supra,* 441 U.S. 434, the "dormant" foreign commerce clause test of constitutional review was formulated. ▆ That test incorporates, among other things, the test for dormant interstate commerce clause review. (*Id.* at pp. 444-445 [60 L.Ed.2d at pp. 345-346].) The latter test upholds a state tax against an interstate commerce clause challenge if the tax " '[i] is applied to an activity with a substantial nexus with the taxing State, [ii] is fairly apportioned, [iii] does not discriminate against interstate commerce, and [iv] is fairly related to the services provided by the State.' " (441 U.S. at pp. 444-445, 449, 454 [60 L.Ed.2d at pp. 345-346, 348, 351-352], quoting *Complete Auto Transit, supra,* 430 U.S. at p. 279 [51 L.Ed.2d at p. 331].) Our concern is with the discrimination component of this test.

The California Supreme Court decided in *Barclays* that a dormant foreign commerce clause analysis was unnecessary, concluding that Congress in effect had acted and decided not to prohibit states from applying the WWCR unitary tax method to foreign-based unitary corporate groups. (2 Cal.4th at pp. 741-742.) Taking a general view, then, it is unnecessary to engage in dormant commerce clause analysis here. However, viewing the issue more specifically, the court in *Barclays* carefully focused on the components peculiar to the dormant foreign commerce clause analysis, especially the one-voice component. The *Barclays court did not address, as did the trial court, the discrimination component incorporated from the dormant interstate commerce clause test of Complete Auto* into the dormant foreign commerce clause test of *Japan Line.* For that reason, we will consider the merits of the discrimination issue as applied to plaintiffs.[1]

The principles which guide our analysis are culled largely from decisions involving the effect of state taxes on interstate commerce. *Japan Line*'s

---

[1]In its remand, the court in *Barclays* stated: "Our holding does not end the matter, however. The trial court held that the cost to a foreign-based unitary enterprise of furnishing financial data required by the Board's use of the worldwide formula apportionment method—the so-called 'compliance burden'—violated due process. In addition, it held that same burden violated the nondiscrimination requirement of the four-part dormant interstate commerce clause analysis under *Complete Auto Transit, Inc.. v. Brady, supra,* 430 U.S. 274. [¶] The Court of Appeal explicitly declined to decide the due process issue and does not appear to have passed directly on the nondiscrimination issue. The due process issue is a fact-dependent question that should be decided by the Court of Appeal in the first instance; moreover, we think its examination of the issue would profit from a consideration of its merit free of the

incorporation of the interstate commerce clause discrimination component validates its use in the foreign commerce context. (See also *Container, supra*, 463 U.S. at p. 170 [77 L.Ed.2d at pp. 556-557].)

Under that component, a state may not impose a tax which discriminates against foreign commerce either by providing a "direct commercial advantage" to domestic commerce or by subjecting foreign commerce to multiple taxation.[2] (*Northwestern States Portland Cement Co.* v. *Minnesota* (1959) 358 U.S. 450, 458 [3 L.Ed.2d 421, 427, 79 S.Ct. 357]; *Maryland, supra*, 451 U.S. at p. 754 [68 L.Ed.2d at pp. 600-601]; *Boston Stock Exchange* v. *State Tax Comm'n* (1977) 429 U.S. 318, 329 [50 L.Ed.2d 514, 524, 97 S.Ct. 599]; see *Kraft Foods* v. *Iowa Dept. of Rev.* (1992) 505 U.S. __, __ [120 L.Ed.2d 59, 65, 67-68, 112 S.Ct. 2365].) A state discriminates against foreign commerce if it imposes a burden on that commerce which is not imposed on domestic or in-state commerce, or if it favors domestic/in-state commerce without a comparable favor for foreign commerce. (*Kraft Foods, supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 68]; *American Trucking Associations, Inc.* v. *Larson* (3d Cir. 1982) 683 F.2d 787, 798, fn. 10.) A finding that a state tax discriminates may be made on the basis of either discriminatory purpose or discriminatory effect. (*Bacchus Imports, Ltd.* v. *Dias* (1984) 468 U.S. 263, 270 [82 L.Ed.2d 200, 208-209, 104 S.Ct. 3049].)[3]

Foreign-based corporate groups incur greater administrative costs to comply with California's WWCR system than do their domestic-based counterparts. In a nutshell, this distinction between domestic and foreign-based multinationals is a result of the following: while domestic-based multinationals keep most of their records in English, in United States currency and

view that a dormant foreign commerce clause analysis is appropriate in the circumstances present here." (2 Cal.4th at p. 742.)

[2] In the compliance burden context presented here, there is no issue of multiple taxation. (See also *Container, supra*, 463 U.S. at pp. 189-193 [77 L.Ed.2d at pp. 568-571].)

[3] The recent United States Supreme Court decision in *Kraft Foods* did not hold that the "direct commercial advantage" principle enshrined in interstate commerce clause analysis (see *Portland Cement Co., supra*, 358 U.S. at p. 458) is irrelevant in the foreign commerce clause discrimination context. Instead, *Kraft* rejected the claim that since Iowa businesses do not receive a commercial advantage over foreign commerce under Iowa's tax system, that system does not violate the discrimination component of the foreign commerce clause test. (505 U.S. at pp. __, __-__ [120 L.Ed.2d at pp. 65, 67-68].) As the court in *Kraft* noted: "[W]e think that a State's preference for domestic commerce over foreign commerce is inconsistent with the Commerce Clause even if the State's own economy is not a direct beneficiary of the discrimination. As the absence of local benefit does not eliminate the international implications of the discrimination, it cannot exempt such discrimination from Commerce Clause prohibitions." (*Id.* at p. __ [120 L.Ed.2d at p. 68]

Following up on this theme, the court in *Kraft* reiterated that if Iowa's tax statute "does not favor business activity in the United States generally over business activity abroad . . . this would indeed suggest that the statute does not discriminate against foreign commerce." (505 U.S. at p. __ [120 L.Ed.2d at p. 68].)

in accord with United States accounting and tax accounting principles, the same cannot be said for multinationals based abroad. (See Comptroller General Rep., *Key Issues Affecting State Taxation of Multijurisdictional Corporate Income Need Resolving,* 3, GAO/GGD-82-38 (1982) p. 39.) For the foreign parent, some of the information may not be available because different nations use different accounting methods. (See 23 Columbia J., *supra,* p. 471.) The information that does exist is not always in the language, in the currency, and in accord with the accounting principles just noted. Significant costs are incurred in obtaining the necessary information on a worldwide basis, and translating and transforming it to these modes. (See Comment, *California's Corporate Franchise Tax: Taxation of Foreign Source Income?* (1980) 20 Santa Clara L.Rev. 123, 143-144; 23 Columbia J., *supra,* at p. 471.)

■ The question is whether this distinction in "compliance burden" comprises an unconstitutional discrimination against plaintiffs. We conclude it does not.

The California WWCR unitary tax method does not discriminate against foreign-based unitary groups by providing a "direct commercial advantage" to in-state/domestic-based unitary groups. Under that method, both groups are treated the same—they face the same tax rate and must furnish the same kind of information. (§§ 25101, 25120-25138; Cal. Code Regs., tit. 18, § 25137-6.) It is well settled that a multijurisdictional enterprise " 'must pay its way' " regarding state taxation. (See 9 Witkin, Summary of Cal. Law (9th ed. 1989) Taxation, § 64, p. 84 and cases cited therein.) Therefore, a foreign-based multijurisdictional enterprise, in complying with a particular jurisdiction's taxation scheme, must always present its tax information in the language, currency and accounting principles the authorities in that jurisdiction understand. This does not constitute a *direct* commercial advantage to unitary groups based in that jurisdiction. At most, it constitutes an indirect cost inherent in doing business in *foreign* lands.

It is argued that domestic-based unitary groups, as opposed to foreign-based groups, must already compile the information required by the California WWCR tax method to comply with federal tax laws. This, however, does not render the WWCR method unconstitutionally discriminatory. Discrimination against foreign-based commerce entails imposing a burden on such commerce which is not imposed on domestic-based commerce, or favoring domestic commerce without a comparable favor for foreign commerce. (*Kraft Foods, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 68]; *American Trucking, supra,* 683 F.2d at p. 798, fn. 10.) Under California's WWCR tax

method, no burden is imposed on foreign-based commerce which is not imposed on domestic-based commerce and no favor is granted domestic commerce which is denied to foreign commerce. *American Trucking* illustrates this point well. In that case, a Pennsylvania statute requiring that all motor carriers be periodically inspected was challenged on interstate commerce clause grounds. The plaintiffs argued that the statute discriminated against out-of-state motor carriers because Pennsylvania motor carriers "were already subject to" a state inspection program. (*Ibid.*) The court disagreed, noting that no discriminatory burdens were imposed on out-of-state carriers and no discriminatory favors were granted Pennsylvania carriers. (683 F.2d at p. 798, fn. 10.)[4] In any event, the constitutionality of California's WWCR tax method must be examined on its own—its constitutionality cannot depend on the "shifting complexities" of the federal tax laws. (See *Armco Inc.* v. *Hardesty* (1984) 467 U.S. 638, 644-645 [81 L.Ed.2d 540, 547-546, 104 S.Ct. 2620].)

Moreover, cost of compliance has not traditionally been thought of as constitutionally determinative in the commerce clause context. As noted in *Bibb* v. *Navajo Freight Lines* (1959) 359 U.S. 520 [3 L.Ed.2d 1003, 79 S.Ct. 962], "Cost *taken into consideration with other factors* might be relevant in some cases to the issue of burden on commerce." (*Id.* at p. 526 [3 L.Ed.2d at p. 1008], italics added; see also *Raymond Motor Transportation, Inc.* v. *Rice* (1978) 434 U.S. 429, 445 [54 L.Ed.2d 664, 677-678, 98 S.Ct. 787]: "The regulations substantially increase the cost of [interstate movement of goods], a fact which is not . . . entirely irrelevant.") Although *Bibb* and *Raymond* involved highway safety regulations where compliance costs may weigh less in the balance (see *Brotherhood* v. *Chicago, R. I. & P. R. Co.* (1968) 393 U.S. 129, 140 [21 L.Ed.2d 289, 297-298, 89 S.Ct. 323]), the two decisions

[4]*Hunt* v. *Washington Apple Advertising Comm'n* (1977) 432 U.S. 333 [53 L.Ed.2d 383, 97 S.Ct. 2434], cited by the trial court, is distinguishable in this respect. In that case, a North Carolina statute was invalidated as an unconstitutional discrimination against out-of-state commerce. The statute required all closed containers of apples sold in North Carolina to display either the applicable United States Department of Agriculture (U.S.D.A.) grade or no classification. State grades were expressly prohibited. This requirement was *inconsistent* with the practice of Washington state apple growers whose containers were preprinted with a state grade classification that was at least the equivalent of, and in many cases superior to, the U.S.D.A. grade. (432 U.S. at pp. 336-337 [53 L.Ed.2d at pp. 389-390].) The discrimination resulted from the fact that North Carolina apple producers, unlike their Washington competitors, were not forced to *alter* established marketing practices in order to comply with the statute. (432 U.S. at p. 351 [53 L.Ed.2d at p. 399]; see *American Trucking, supra,* 683 F.2d at p. 798, fn. 10.) By contrast, both foreign-based multinationals and domestic-based multinationals are saddled with the same kind of burden in complying with California's WWCR tax method because they must both furnish the same kind of information. In line with the principle enunciated in *American Trucking*, it does not matter that domestic-based multinationals are "already subject to" a procedure for which they must gather this information.

illustrate that administrative costs of compliance, alone, are generally insufficient to be deemed an unconstitutional burden. (See *Bibb, supra,* at p. 526 [3 L.Ed.2d at p. 1008]; *Brotherhood, supra,* at p. 140 [21 L.Ed.2d at p. 297-298].) It is one thing to invoke cost of compliance *as a factor* bearing on the risk of foreign retaliation, such risk itself being only a factor in determining whether foreign policy is implicated under the "one-voice" component of dormant foreign commerce clause analysis. (See *Container, supra,* 463 U.S. at p. 195 [77 L.Ed.2d at pp. 572-573].) It is quite another thing to invoke administrative cost of compliance as the single determinant of unconstitutional discrimination against foreign-based unitary groups.

In *Northwestern States Portland Cement Co. v. Minnesota, supra,* 358 U.S. 450, the court upheld, against a commerce clause challenge, a state tax law that levied taxes on that portion of an out-of-state corporation's net income earned from business activities that were within the taxing state but exclusively in furtherance of interstate commerce. (358 U.S. at pp. 452, 461-463 [3 L.Ed.2d at pp. 423-424, 429-430].) Justice Frankfurter, in dissent, believed the law unconstitutionally burdened interstate commerce in part because "there are thousands of relatively small or moderate size corporations doing exclusively interstate business spread over several States. To subject these corporations to a separate income tax in each of these States means that they will have to keep books, make returns, store records, and engage legal counsel, all to meet the divers and variegated tax laws of forty-nine States, . . . This will involve large increases in bookkeeping, accounting, and legal paraphernalia to meet these new demands. The cost of such a far-flung scheme for complying with the taxing requirements of the different States may well exceed the burden of the taxes themselves, . . ." (*Id.* at p. 474 [3 L.Ed.2d at pp. 447-448] (dis. opn. of Frankfurter, J.).) Although the majority opinion did not explicitly address Justice Frankfurter's point on cost of compliance, that opinion did note that the tax at issue did not "discriminate against nor subject [the] corporation[s] to an undue burden," and that "[i]n this type of case the taxpayers must show . . . a burden upon interstate commerce in a constitutional sense. This they have failed to do." (*Id.* at pp. 461, 463 [3 L.Ed.2d at pp. 429, 430].)

In determining whether a tax law imposes a "discriminatory burden" on foreign commerce (see *Boston Stock Exchange, supra,* 429 U.S. at p. 331 [50 L.Ed.2d at p. 525]), how the law works in its "practical operation" rather than its label or appearances will control the decision. (*Nippert v. Richmond* (1946) 327 U.S. 416, 425, 431 [90 L.Ed. 760, 765, 768-769, 66 S.Ct. 586]; 9 Witkin, Summary of Cal. Law, *supra,* Taxation, § 65, p. 85.) As stated in *Nippert,* "Not the tax in a vacuum of words, but its practical

consequences for the doing of interstate commerce in applications to concrete facts are our concern." (327 U.S. at p. 431 [90 L.Ed.. at pp. 768-769].)

Plaintiffs argue that "literal compliance" with the WWCR tax method is cost-prohibitive. In light of the principle set forth in *Nippert*, however, this argument loses much of its force. The application of the WWCR method to unitary businesses with foreign country operations is guided by California Code of Regulations, title 18, section 25137-6. Under that regulation, the Board, in computing the income and the apportionment formula factors for a combined report, "shall consider the effort and expense required to obtain the necessary information. In appropriate cases, such as when the necessary data cannot be developed from financial records maintained in the regular course of business, the . . . Board may accept reasonable approximations"; moreover, taxpayers can seek "advance determination[s]" under any provision of the regulation.[5] Here, the record shows that the plaintiffs and the Board used these provisions and that computations based on reasonable approximations were made. Practically speaking, therefore, the plaintiffs did not have to "comply literally." Applying the concrete facts here, it is evident that "literal compliance" is a "label" or "appearance" not controlling to the relevant practical determination involving the commerce clause in this case. In any event, the evidence showed that "literal compliance" was cost-prohibitive for domestic-based unitary corporate groups as well. The domestic-based and foreign-based groups therefore stand on relatively equal footing regarding "literal compliance." Consequently, such compliance cannot serve as a *discriminatory* burden against the foreign-based groups.[6]

In short, the burden for plaintiffs in complying with California's unitary tax method of WWCR did not involve "the type of differential tax treatment" that results in an unconstitutional discrimination under the foreign commerce clause test set forth in *Complete Auto* and *Japan Line*. (See *Commonwealth Edison Co.* v. *Montana* (1981) 453 U.S. 609, 618 [69 L.Ed.2d 884, 894-895, 101 S.Ct. 2946].)[7]

---

[5]At trial, the parties and the court used the term "literal compliance" to mean the application of the WWCR regulation (Cal. Code Regs., tit. 18, § 25137-6) without the relief clauses of "reasonable approximations" and "advance determination." (*Id.*, subd. (e)(1) and (e)(2).)

[6]This "practical operation" focus does not foreclose a tax law being invalidated as discriminatory on its face. (*Memphis Steam Laundry* v. *Stone* (1952) 342 U.S. 389, 395 [96 L.Ed. 436, 440-441, 72 S.Ct. 424]; see *Bacchus Imports, Ltd.,* v. *Dias, supra,* 468 U.S. at p. 268 [82 L.Ed.2d at p. 207].) California's unitary tax method of WWCR does not discriminate on its face against foreign-based corporate groups. (See Cal. Code Regs., tit. 18, § 25137-6.)

[7]In a recent case our Supreme Court used the *Complete Auto* discrimination test to hold that California discriminated against interstate commerce by imposing higher license fees on out-of-state vehicles and by imposing higher use taxes on vehicles purchased from private

### 3. *The Due Process Clause*

In this context, there are two issues relating to "compliance burden": first, whether the WWCR administrative cost of compliance to plaintiffs is unreasonable, undue or arbitrary; and second, whether the WWCR compliance process is without reasonably adequate standards to guide enforcement. At trial, the focus was on the second issue.

Largely for the reasons expressed in our discussion above, we cannot say the WWCR administrative cost of compliance to plaintiffs is unconstitutionally unreasonable, undue or arbitrary. (See *Portland Cement, supra*, 358 U.S. at pp. 452, 461, 463, 474 [3 L.Ed.2d at pp. 423-424, 430, 447-448].) There is no evidence in the record that a nonarbitrary application of the section 25137-6 WWCR regulation results in such a cost.

As for the second issue, the trial court stated as follows: "Plaintiffs claim that because an element of the WWCR [California Code of Regulations, title 18, section 25137-6] calls for materiality, reasonable approximations, and advance determinations, all at the unfettered discretion of [the Board], with no guidelines, there is a violation of the due process clauses (both U.S. and California) insofar as the tax relates to a foreign multi-national. [¶] The WWCR regulation [§ 25137-6] is not on its face uncertain, nor does the approximation segment make it uncertain. Its taxing rules are sufficiently clear and understandable to satisfy due process. The discretionary advance determination, reasonable approximation, and materiality rules (materiality does not really belong in this thought—it is inherent and essential in every tax scheme) are only there to the extent a taxpayer seeks to avail himself of them. They are not imposed willy-nilly. [¶] What does constitute a due process violation is the fact that all witnesses agreed that with customarily and currently available accounting data, literal compliance with WWCR requirements is impossible for foreign multi-nationals such as Plaintiffs, and the only way to 'comply' is by supplication and negotiation (absent an unduly burdensome cost of compliance). There is no reasonable certainty and no judicial reason to believe that whatever the taxpayer considers reasonable or material will be so treated by the [Board]. . . . [¶] Thus I conclude that WWCR as applied to Plaintiffs violates due process, both federal and state. ([Cf.] *Chy Lung* v. *Freeman* (1876) [2 Otto] 92 U.S. 275 [23 L.Ed. 550]; *Grayned* v. *Rockford* (1972) 408 U.S. 104 [33 L.Ed.2d 222, 92 S.Ct. 2294]; *McDonnell Douglas Corp.* v. *Franchise Tax Bd.* (1968) 69 C.2 506 [72 Cal.Rptr. 465, 446 P.2d 313])."

---

parties in other states. (*Woosley* v. *State of California, supra*, 3 Cal 4th 758 at pp. 781-782, 783.) The *Woosley* court found this discrimination to be a patent violation of the commerce clause. (*Id.* at pp. 778, 781-782.) As we have explained above, no such discrimination is implicated here.

We agree with the trial court that California Code of Regulations, title 18, section 25137-6 (hereafter, regulation 25137-6) is not on its face uncertain and that its taxing rules are sufficiently clear and understandable to satisfy due process. We disagree with the trial court that regulation 25137-6 violates due process by allowing "unfettered discretion" in the tax authorities in the wake of "literal compliance." We conclude the regulation can be construed to contain constitutionally adequate standards to guide application.[8]

---

[8]Regulation 25137-6 provides in pertinent part: "(1) Unitary Business. A taxpayer is engaged in a unitary business (or a single business within the meaning of Reg. 25120(b)) when its activities within the state contribute to or are dependent upon its activities without the state. A unitary business exists when there is unity of ownership, unity of operation and unity of use.

"(2) Translation Method for Determining Income. The translation method to be used for determining income shall be the 'profit and loss method' as set forth in this regulation. . . .

"(3) General Applicability of UDITPA Regulations. The general regulations for UDITPA, Regs. 25120-25139, inclusive, shall be applicable except as otherwise provided in this regulation.

"(b) Determination of income.

"(1) The income of a unitary business with operations in foreign countries shall be computed in the following manner:

"(A) A profit and loss statement shall be prepared for each foreign branch or corporation in the currency in which the books of account of the branch or corporation are regularly maintained.

"(B) Adjustments shall be made to the profit and loss statement to conform it to the accounting principles generally accepted in the United States for the preparation of such statements except as modified by this regulation.

"(C) Adjustments shall be made to the profit and loss statement to conform it to the tax accounting standards required under Division 2, Part 11 of the Revenue and Taxation Code.

"(D) The profit and loss statement of each branch or corporation, whether U.S. or foreign, shall be translated into the currency in which the parent company maintains its books and records in accordance with subsection (b)(4).

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(2) In lieu of the procedures set forth in subsection (b)(1) and subject to the determination of the Franchise Tax Board that it reasonably reflects income, a unitary business with operations in a foreign country may determine its income on the basis of the consolidated profit and loss statement prepared for the related corporations of which the unitary business is a member which is prepared for filing with the Securities and Exchange Commission. If the business is not required to file with the Securities and Exchange Commission, the consolidated profit and loss statement prepared for reporting to shareholders and subject to review by an independent auditor may be used. . . .

"(C) No adjustment shall be required under subsections (b)(3)(A) [accounting adjustments] and (b)(3)(B) [tax accounting adjustments] unless it is material. Whether an adjustment is material depends upon the facts and circumstances of the particular case, including the amount of the adjustment, its size relative to the general level of the corporation's total assets and annual profit or loss, the consistency with which the practice has been applied, and whether the item to which the adjustment relates is of a recurring or a nonrecurring nature.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(e) Application of Regulation.

"(1) In computing the income and any of the factors required for a combined report, the Franchise Tax Board shall consider the effort and expense required to obtain the necessary

■ "Administrative regulations are subject to the same rules of construction and interpretation that apply to statutes." (*Organization of Deputy Sheriffs* v. *County of San Mateo* (1975) 48 Cal.App.3d 331, 341 [122 Cal.Rptr. 210].) So long as the regulation was properly adopted and does not transgress its statutory derivation, it " 'comes before the court with a presumption of correctness and regularity.' " (*L.A.J., Inc.* v. *State Bd. of Equalization* (1974) 38 Cal.App.3d 549, 553 [113 Cal.Rptr. 319]; see *Parfums-Corday, Inc.* v. *State Bd. of Equalization* (1986) 187 Cal.App.3d 630, 636 [232 Cal.Rptr. 56].)

■ Nevertheless, to pass muster under the federal and state due process clauses, a regulation must provide reasonably adequate standards to guide enforcement. (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 702 [209 Cal.Rptr. 682, 693 P.2d 261]; *Britt* v. *City of Pomona* (1990) 223 Cal.App.3d 265, 278 [272 Cal.Rptr. 724].) Government regulation must be sufficiently clear so that it is understandable and does not encourage arbitrary and discriminatory application. (*Chalmers* v. *City of Los Angeles* (9th Cir. 1985) 762 F.2d 753, 757; *Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108 [33 L.Ed.2d 222, 227-228, 92 S.Ct. 2294]; *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 231, fn. 30 [82 Cal.Rptr. 175, 461 P.2d 375].) A statute, and hence a properly adopted regulation, will not be held void for uncertainty if any reasonable and practical construction can be given its language. (*Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 405 [89 Cal.Rptr. 78, 47 A.L.R.3d 286]; see *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193].) Vagueness is less a concern if an enterprise has the ability to clarify the meaning of an economic regulation in advance by resort to an administrative process. (*Chalmers, supra,* 762 F.2d at p. 757; *Village of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.* (1982) 455 U.S. 489, 498 [71 L.Ed.2d 362, 371-372, 102 S.Ct. 1186].)

---

information. In appropriate cases, such as when the necessary data cannot be developed from financial records maintained in the regular course of business, the Franchise Tax Board may accept reasonable approximations.

"(2) A taxpayer may request an advance determination under subsections (b)(2) [consolidated SEC/shareholder profit and loss statement], (b)(3)(C) [materiality], (c)(1) [exchange rates], (d)(1) [computation of property factor] or any other provision of this regulation by submitting a determination request to the Legal Division of the Franchise Tax Board. Such a determination shall be made on an individual basis and shall be limited to the particular facts or circumstances set forth in the determination request. The facts and circumstances upon which a determination is made remain subject to review. Failure to request or to obtain a favorable advance determination will not preclude consideration of requested variances in subsequent proceedings."

The central concern here involves subdivision (e) of regulation 25137-6, entitled "Application of Regulation" and providing: "(e)(1) In computing the income and any of the factors required for a combined report, the Franchise Tax Board shall consider the effort and expense required to obtain the necessary information. In appropriate cases, such as when the necessary data cannot be developed from financial records maintained in the regular course of business, the Franchise Tax Board may accept reasonable approximations. [¶] (2) A taxpayer may request an advance determination under any . . . provision of this regulation by submitting a determination request to the Legal Division of the Franchise Tax Board. Such a determination shall be made on an individual basis and shall be limited to the particular facts or circumstances set forth in the determination request. The facts and circumstances upon which a determination is made remain subject to review. Failure to request or to obtain a favorable advance determination will not preclude consideration of requested variances in subsequent proceedings."

The trial court held that with "literal compliance" in the wings, "[t]here is no reasonable certainty and no judicial reason to believe that whatever the taxpayer considers reasonable or material will be so treated by the [Board]," and that "the only way to 'comply' [with the WWCR method] is by supplication and negotiation." We disagree and conclude that the discretion vested in the Board under regulation 25137-6 to accept reasonable approximations and to make materiality and advance determination decisions is subject to reasonably adequate standards to guide enforcement as that regulation is interpreted herein.

Initially, we must consider the relevance of "literal compliance" in this case in its factual and legal contexts. The evidence here showed that "literal compliance" was more an abstraction than a matter of how the WWCR method was actually applied. Plaintiffs and the Board used reasonable approximations and readily accessible corporate documents in the WWCR process. Plaintiffs' cost in filing under the WWCR system in the 1970's was shown to be relatively modest.[9] And there is no evidence the Board arbitrarily (as opposed to mistakenly) applied regulation 25137-6 to plaintiffs.

The legal context invoked here concerns the multijurisdictional allocation of income. It is long since settled that a multijurisdictional enterprise "must

---

[9] For BBI, on the order of $900 to $1,250 per year for three annual tax returns filed in the 1970's. In 1977, the tax year in question, BBI was engaged in business directly or through its approximately 70 subsidiaries in 55 countries. These tax return filing fees do not encompass BBL which, in addition to owning BBI and BBI's subsidiaries, owned 140 additional subsidiaries and operated in 5 additional countries. Thus, in 1977, BBI and its subsidiaries comprised approximately one-third the total number of subsidiaries within the BBL unitary group.

pay its way" to each jurisdiction contributing to the flow or derivation of value. (See 9 Witkin, Summary of Cal. Law, *supra*, Taxation, § 64, p. 84.) The difficult task is how to assign a particular value to a particular jurisdiction for tax purposes. Although the general premise of "paying one's own way" is widely accepted and intuitively sound, the application of this premise graphically exemplifies the old adage that the "devil is in the details." As stated in *International Harvester Co.* v. *Evatt* (1947) 329 U.S. 416, 422 [91 L.Ed. 390, 395, 67 S.Ct. 444], "this Court has long realized the practical impossibility of a state's achieving a perfect apportionment of expansive, complex business activities . . . and has declared that 'rough approximation rather than precision' is sufficient." Our Supreme Court, in *McDonnell Douglas Corp.* v. *Franchise Tax Bd.* (1968) 69 Cal.2d 506, 511 [72 Cal.Rptr. 465, 446 P.2d 313], echoed this theme by quoting from *El Dorado Oil Works* v. *McColgan* (1950) 34 Cal.2d 731, 741 [215 P.2d 4] as follows: " 'No method of allocation can precisely determine the exact amount of income attributable either to any given geographic area or to any given part of a series of business transactions culminating in the realization of a profit, and "any effort" in that regard "must be more or less arbitrary and fictitious" [citation] as a matter of practical tax administration.' "

Finally, as the court in *Container* recognized, "Both geographical accounting [i.e., separate accounting] and formula apportionment [i.e., WWCR] are imperfect proxies for an ideal which is not only difficult to achieve in practice, but also difficult to describe in theory." (463 U.S. at p. 182 [77 L.Ed.2d at p. 564].)

It is these factual and legal recognitions that make "literal compliance" less relevant and practical administrative discretion more significant in the WWCR due process equation presented here. (See also *Amoco Production Company* v. *Armold* (1974) 213 Kan. 636 [518 P.2d 453, 464] ["the allocation and apportionment of the income of a multistate corporation is a subject for administrative expertise in accord with statutory direction"]; Wahrhaftig, *Allocation Factors in Use in California* (1960) 12 Hastings L.J. 65, 92.) In this way, "literal compliance" cannot be considered the overriding factor of whether the due process clause has been violated in this case; however, the Board must still be subject to reasonably adequate standards to guide its application of the factors in regulation 25137-6 regarding reasonable approximation, materiality and advance determination. (*Fisher, supra*, 37 Cal.3d at p. 702; *Britt, supra*, 223 Cal.App.3d at p. 278.) As we construe that section, those standards are present.

Under regulation 25137-6, subdivision (e)(1), the Board, in computing the income and the factors required for WWCR, must consider the effort and

expense for the taxpayer in obtaining the necessary information. In appropriate cases, the Board may accept reasonable approximations "such as when the necessary data cannot be developed from financial records maintained in the regular course of business." (*Ibid.*) It is this mandatory consideration of effort and expense against the backdrop of data development from regularly maintained documents that circumscribes the Board's discretion under regulation 25137-6 and provides a framework for meaningful judicial review if the Board arbitrarily exercises that discretion. As the regulation notes, examples of these regularly maintained documents include profit and loss statements filed with the Securities and Exchange Commission or profit and loss statements prepared for shareholders and subject to review by independent auditors. (Reg. 25137-6, subd. (b)(2).) In light of these examples, we find that regulation 25137-6 does not contemplate an intricate, time-consuming and expensive data development process. In short, the Board must consider the cost and effort of producing WWCR information in deciding whether to accept reasonable approximations, and that consideration is to use regularly maintained or other readily accessible corporate documents as the cost guideline. Given this, we also find that a court can determine, on a principled basis, whether the Board is acting arbitrarily in refusing to use reasonable approximations or in requesting certain information, information that can be compared easily to these generally understood records. (See *Fisher, supra*, 37 Cal.3d at p. 703; on the general issue of judicial review in the administrative tax proceeding context, see *People* ex rel. *Franchise Tax Bd.* v. *Superior Court* (1985) 164 Cal.App.3d 526, 545-546 [210 Cal.Rptr. 695]; *Aronoff* v. *Franchise Tax Board* (1963) 60 Cal.2d 177, 179-180 [32 Cal.Rptr. 1, 383 P.2d 409]; see also *California* v. *Grace Brethren Church* (1982) 457 U.S. 393, 417 [73 L.Ed.2d 93, 112, 102 S.Ct. 2498].)

It must also be noted that the Board's discretion takes place in the application of an apportionment formula that the court in *Container* described as "something of a benchmark against which other apportionment formulas are judged." (463 U.S. at p. 170 [77 L.Ed.2d at pp. 556-557].) And the statutory basis of regulation 25137-6, Revenue and Taxation Code section 25137, is itself built on a "reasonable" foundation subject to the Board's discretion; this discretion was validated in the *McDonnell Douglas* decision. (69 Cal.2d at pp. 511-512.)

 Nor is the standard of "reasonable," in the context presented here, so formless as to constitute a violation of due process. "Reasonable" is a standard peppered throughout the law, and is an appropriate standard in the context of multijurisdictional allocation of income arising from expansive, complex business activities. In this context, " 'rough approximation rather

than precision' " has been deemed sufficient, and any effort in this regard has been recognized to " 'be more or less arbitrary and fictitious'. . . as a matter of practical tax administration." (*International Harvester Co., supra*, 329 U.S. at p. 422 [91 L.Ed. at p. 395]; *McDonnell Douglas Corp., supra*, 69 Cal.2d at p. 511.) In the tax arena, the United States Supreme Court has upheld against a due process vagueness challenge a tax conviction premised on the standard of a " 'reasonable allowance for salaries' " for business deduction purposes. (*United States* v. *Ragen* (1942) 314 U.S. 513, 524 [86 L.Ed. 383, 390-391, 62 S.Ct. 374].) The court noted that "[d]etermination of allowable deductions by reference to a standard of 'reasonableness' is not unusual under federal income tax laws," and that such a standard, even applied in a (proper) penal context, is not too vague to afford a practical guide to permissible conduct. (*Id.* at pp. 522-523 [86 L.Ed. at pp. 389-390]; see also Note, *The Void-For-Vagueness Doctrine In The Supreme Court* (1960) 109 U.Pa.L.Rev. 67.)

In fact, the system plaintiffs advocate employs a standard akin to reasonable approximation. The federal system of separate accounting determines and allocates income to related businesses in a multijurisdictional enterprise by estimating what transaction costs would be incurred were the companies unrelated and dealing at arm's length. (26 U.S.C. § 482.) Indeed, tax authorities are given broad discretion to make these determinations. (*Dolese* v. *C.I.R.* (10th Cir. 1987) 811 F.2d 543, 546; *Peck* v. *C.I.R.* (9th Cir. 1985) 752 F.2d 469, 471-472.) These determinations will not be overturned unless they are shown to be arbitrary, capricious, or unreasonable. (*Ibid.*) Plaintiffs argue that 26 United States Code section 482, unlike the WWCR procedure, does not encompass a tax system based entirely on approximations. But the section 482 process goes to the heart of the federal income tax system for related businesses by allocating the income, deductions, credits or allowances for the respective businesses to prevent evasion of taxes or to reflect income clearly. (26 U.S.C. § 482; *Peck, supra*, at p. 471.) In this way, both WWCR and section 482 significantly use approximations to determine income.

Finally, there is no evidence here that the Board arbitrarily applied the reasonable approximation standard while dangling plaintiffs over the "literal compliance" flame. There is evidence the Board made a mistake in the approximating process, but the Board and plaintiffs were working substantively in that process. The trial court cautioned that "[b]ureaucratic mistakes and excesses are always possible." That is true. But it is also true that such mistakes and excesses can be remedied through administrative or judicial review. As previously noted, the Board's discretion regarding reasonable

approximations is circumscribed and guided by our interpretation of regulation 25137-6, subdivision (e)(1)'s mandatory consideration of cost and effort. (See *Grayned* v. *City of Rockford, supra,* 408 U.S. at p. 108; *Morrison* v. *State Board of Education, supra,* 1 Cal.3d at p. 231, fn. 30; *Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at p. 702.)

We conclude the Board's "reasonable approximations" discretion is subject to reasonably adequate standards to guide application and therefore is not unconstitutional under the state or federal due process clause. (*Fisher, supra,* 37 Cal.3d at pp. 702-703; *Britt, supra,* 223 Cal.App.3d at p. 278.)

That brings us to the Board's discretion regarding materiality determinations. The question of materiality asks whether certain differences—generally regarding different accounting or tax accounting practices—are material or immaterial to the overall tax computation. (See reg. 25137-6, subds. (b)(1)(B), (b)(1)(C), (b)(2)(A), (b)(3)(C).) As the trial court rightfully acknowledged, the concept of materiality is inherent and essential in every tax scheme. Regulation 25137-6 sets forth specific guidelines for materiality determinations. Under the regulation, "[W]hether an adjustment is material depends upon the facts and circumstances of the particular case, including the amount of the adjustment, its size relative to the general level of the corporation's total assets and annual profit or loss, the consistency with which the practice has been applied, and whether the item to which the adjustment relates is of a recurring or a nonrecurring nature." (Reg. 25137-6, subd. (b)(3)(C).) As with reasonable approximations, the Board's discretion in determining whether something is material cannot be made arbitrarily or capriciously. (See *Chalmers, supra,* 762 F.2d at p. 757; *Grayned, supra,* 408 U.S. at p. 108 [33 L.Ed.2d at pp. 277-278]; *Morrison, supra,* 1 Cal.3d at p. 231, fn. 30.) There is no reason to believe that will occur in light of these provisions guiding that discretion. We conclude the Board's "materiality" determinations are subject to reasonably adequate standards to guide application and therefore are not unconstitutional under the state or federal due process clause. (*Fisher, supra,* 37 Cal.3d at p. 702; *Britt, supra,* 223 Cal.App.3d at p. 278.)

The third challenged area of Board discretion concerns "advance determination." Under regulation 25137-6, subdivision (e)(2), "[a] taxpayer may request an advance determination under . . . any . . . provision of this regulation by submitting a determination request to the Legal Division of the Franchise Tax Board. Such a determination shall be made on an individual basis and shall be limited to the particular facts or circumstances set forth in the determination request. The facts and circumstances upon which a determination is made remain subject to review. Failure to request or to obtain a

favorable advance determination will not preclude consideration of requested variances in subsequent proceedings."

The problem for plaintiffs on this issue is that an avenue of advance administrative determination usually undermines rather than supports a due process challenge for uncertainty or unfettered discretion. (See *Chalmers, supra,* 762 F.2d at p. 757; *Village of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc., supra,* 455 U.S. at p. 498 [71 L.Ed.2d at pp. 371-372].) This is particularly true here where the avenue is so wide. Under regulation 25137.6, subdivision (e)(2), the taxpayer may request an advance determination under any provision of the regulation and the Board is obligated to act substantively on that request. Moreover, subdivision (e)(2) provides that "[f]ailure to request or to obtain a favorable advance determination will not preclude consideration of requested variances in subsequent proceedings." The Board's discretion is tempered by this provision since the taxpayer can raise the point again. And the Board's discretion regarding the meaning of or decisions on "reasonable approximations" and materiality is tempered by this advance determination option.

The cases relied upon by plaintiffs and the trial court in this respect are either distinguishable or compatible with our reasoning. The statute invalidated in *Chy Lung* v. *Freeman* (1876) 92 U.S. (2 Otto) 275 [23 L.Ed. 550] gave the California Commissioner of Immigration the power " 'To satisfy himself whether or not any passenger who shall arrive in the State by vessels from any foreign port or place (who is not a citizen of the United States) is lunatic, idiotic, deaf, dumb, blind, crippled or infirm, and is not accompanied by relatives who are able and willing to support him, or is likely to become a public charge, or has been a pauper in any other country, or is from sickness or disease (existing either at the time of sailing from the port of departure or at the time of his arrival in the State) a public charge, or likely soon to become so, or is a convicted criminal, or a lewd or debauched woman;' " and to prohibit any such person from landing unless financial arrangements, in many cases accruing to the benefit of the Commissioner, were made. (92 U.S. at p. 277 [23 L.Ed. at p. 551].) As the *Chy Lung* court noted, "[i]t is hardly possible to conceive a statute more skillfully framed, to place in the hands of a single man the power to entirely prevent vessels engaged in a foreign trade, say with China, from carrying passengers, or to compel them to submit to systematic extortion of the grossest kind." (*Ibid.*) In *Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495 [96 L.Ed. 1098, 72 S.Ct. 777] and similar cases, the authorities were vested with significant discretion in sensitive areas such as free speech or free assembly. (See Note, *The Void-For-Vagueness Doctrine, supra,* 109 U.Pa.L.Rev. at p. 82, fn. 78.)

For example, in *Burstyn*, a statute was invalidated that allowed a government censor to ban a film if he concluded it was "sacrilegious." (343 U.S. at p. 506 [96 L.Ed. at p. 1108].) Regulation 25137-6, as we have construed it, does not involve the unbridled discretion or subjective power in sensitive areas exemplified in *Chy Lung* and *Burstyn*.

In its due process analysis, the trial court also cited the decisions in *Grayned* v. *City of Rockford*, *supra*, and *McDonnell Douglas Corp.* v. *Franchise Tax Bd.*, *supra*. We too have relied on these decisions and they are compatible with our reasoning: *Grayned* because it is the widely cited decision which sets forth the basic principle (in construing an antinoise penal ordinance) that to prevent arbitrary and discriminatory enforcement, laws must provide explicit standards for those who apply them; and *McDonnell Douglas* because it illustrates the soundness of broad but rationally guided administrative discretion in the inherently muddled area of multijurisdictional tax allocation. (See also Wahrhaftig, *Allocation Factors in Use in California*, 12 Hastings L.J., *supra*, at p. 92; *Amoco Production Co.* v. *Arnold*, *supra*, 518 P.2d at p. 464.)

Indeed, it is the contexts exemplified in *Grayned* and *McDonnell Douglas* which distinguish the final case upon which plaintiffs rely: *Weissinger* v. *Boswell* (M.D.Ala. 1971) 330 F.Supp. 615. On due process grounds, the court in *Weissinger* invalidated an Alabama statute that granted tax officials wide discretion in the setting of ad valorem assessment rates—the officials were permitted to use rates ranging from 0 to 30 percent of fair market value. (*Id.* at pp. 619, 625.) The court noted that a reasonable degree of certainty and definiteness is required in a tax statute. (*Id.* at p. 624.)

The *Weissinger* principle regarding a reasonable degree of certainty is sound and we have interpreted the "compliance burden" portion of regulation 25137-6 with its view in mind. Nevertheless, the context in which that principle is applied must be considered. "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." (*Hoffman Estates, supra*, 455 U.S. at p. 498 [71 L.Ed.2d at pp. 371-372].) In *Weissinger*, the challenged tax was on real property. Real property is tangible, unmovable, solely within one sovereign jurisdiction for tax purposes, and capable of precise administration. These attributes, by contrast, comprise almost the antithesis of the tax system we encounter here. As the court in *Container* aptly put it, "[b]oth geographical accounting [i.e., separate accounting] and formula apportionment [i.e., WWCR] are imperfect proxies for an ideal which is not only difficult to achieve in practice, but also

difficult to describe in theory." (463 U.S. at p. 182 [77 L.Ed.2d at p. 564].) At this stage in the debate, all thoughtful people agree that multijurisdictional enterprises have to pay their way in their respective jurisdictions. And everyone agrees that geographical accounting or formula apportionment are the only two general methods available to determine the amount to be paid. It is in this inherently imprecise context, then, that we must apply the due process principles on vagueness as they pertain to administrative burden.

## CONCLUSION

We emphasize the narrow scope of our decision. We have concluded that the administrative burden to plaintiffs in complying with WWCR in the context of a proper application of the WWCR regulation, regulation 25137-6, violates neither the nondiscrimination component of dormant commerce clause analysis set forth in *Complete Auto* and *Japan Line* nor state or federal due process. As part of our compliance burden analysis in the due process context, we have concluded that the discretion vested in the Board under regulation 25137-6 to accept "reasonable approximations" and to make materiality and advance determination decisions is subject to reasonably adequate standards to guide application as that regulation is interpreted herein. There is no evidence in the record that the Board applied these aspects of regulation 25137-6 to plaintiffs in an arbitrary, discriminatory or unreasonable way. Consequently, these aspects of regulation 25137-6, as applied to plaintiffs, did not violate due process.

## DISPOSITION

The judgment is reversed, and the trial court is directed to enter a judgment for Board. Each party shall bear its own costs on appeal.

Puglia, P. J., and Sparks, J., concurred.

Petitions for a rehearing were denied December 18, 1992, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied February 18, 1993. Kennard, J., was of the opinion that the petition should be granted.